IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 91-7062
_____


ELLIE E. GRIZZLE                                    Plaintiff-Appellant,


VERSUS


THE TRAVELERS HEALTH NETWORK, INC.          Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

(February 3, 1994)

Before JONES and DeMOSS, Circuit Judges, and SCHWARTZ[*], District
Judge.

SCHWARTZ, District Judge:

Following Ellie Grizzle's ("Grizzle") termination from her
employment by Travelers Health Network, Inc. ("Travelers") her
former employer, she brought suit against it in the district court,
alleging age discrimination, retaliatory discharge for complaining
of age discrimination pursuant to the Age Discrimination in
Employment Act ("ADEA"),[1] and intentional infliction of emotional
distress ("IIED") pursuant to Texas law.  The jury trial on

_____

[*] District Judge of the Eastern District of Louisiana,
sitting by designation.

[1] 29 U.S.C. §§ 621-34.

1

Grizzle's claims lasted approximately two days, and on September 9, 1991, the jury returned a verdict in favor of Travelers on the age discrimination and IIED claims, but found for Grizzle on the retaliation claim, finding Travelers' conduct was "willful." On September 19, 1990, the district court granted Travelers' motion for judgment notwithstanding the verdict on the retaliation claim,[2] and final judgment was thus entered in favor of Travelers on the entire action dismissing all of Grizzle's claims against it.

On appeal, Grizzle seeks reinstatement of the jury's verdict in her favor on the retaliation claim and a new trial on her state law IIED claim, contending that the trial court erred in the following respects: 1) by entering judgment notwithstanding the verdict ("JNOV") on the retaliation claim; 2) by refusing to grant a new trial on Grizzle's IIED claim because of improper statements made by Travelers' counsel during closing argument; 3) by excluding testimony and evidence concerning Grizzle's lost wages; 4) by admitting the testimony of two Travelers' employees who were not fully identified prior to trial; and 5) by excluding certain testimony concerning Travelers' net worth. Finding no reversible error, we affirm.

---

[2]This case was tried before the effective date of the December 1991 amendments to Federal Rule of Civil Procedure 50. Rule 50 now uses the term "judgment as a matter of law" for both a directed verdict and a judgment non obstante veredicto ("JNOV"). However, the commentary makes clear that the legal standards for granting and reviewing such motions remain unchanged. This opinion, for convenience, uses the term "JNOV."

I. FACTUAL AND PERTINENT PROCEDURAL BACKGROUND

A. Facts

Grizzle's challenge of the JNOV requires us to evaluate the sufficiency of the evidence supporting the jury's verdict. We, therefore recite the facts adduced at trial in the light most favorable to that verdict.[3] In any light, the facts of this case are uncomplicated and straightforward.

In March of 1988, Grizzle was hired at age 42 as a general ledger accountant by Travelers, a health maintenance organization ("HMO") "umbrella" company in Las Colinas, Texas. Although she did not have bachelor's degree in accounting, Grizzle had twenty years experience working as an accountant. For the initial period her employment, March 1988 through March 1989, Grizzle achieved an above average rating of "2" because the highest rating (i.e., "1") was reserved for a perfect performance.[4] Grizzle also won an "Outstanding Achievement" award during this period.

In September of 1988, Grizzle applied for, but did not receive a supervisory position. According to Grizzle, during an interview with Finance Director Glen Marconcini ("Marconcini") she was informed by him that, although she was qualified for the promotion, she would not receive it because she rubbed him the wrong way, she

_____

[3]Wilson v. Monarch Paper Co., 939 F.2d 1138, 1139 (5th Cir. 1991).

[4]Originally Grizzle's supervisor Len Nary gave her a performance rating of "1" (the highest rating). It was later reduced to a "2" (an above average rating) by Nary's superior, Regional Vice President and Comptroller Dave Goltz, who explained that a rating of "1" means perfect, and no one is perfect.

3

smoked and also, he was not wild about her age.[5]  Thereafter, Grizzle complained to her immediate supervisor Len Nary ("Nary"), who interceded on her behalf.  As a result of her complaint to Nary, Grizzle received a $2,000 a year raise and was given supervisory authority within her department.  No formal complaint was made with respect to Marconcini's alleged comment and, in fact, favorable employment action followed her informal "complaint" to Nary as heretofore stated.

In March of 1989 Travelers' Las Colinas and Atlanta offices merged. The following month, Kent Latiolais ("Latiolais"), a transferee from Travelers' Atlanta office, was made Grizzle's supervisor. The appointment of Latiolais was in effect a demotion for plaintiff.  Grizzle testified that she met with Traveler's Regional Vice-President and Comptroller Dave Goltz ("Goltz") and expressed concern that she had been passed over for Latiolais' job because of her age and that he "kind of lost his composure for a second," then assured her that he would never discriminate against

---

[5]As Marconcini did not testify, the only evidence of this conversation was plaintiff's own testimony, which is reiterated verbatim below:

> "I don't need to look at your background or your qualifications. . . .  Anyone out there will tell you that you can analyze an account without any problems; that there is nothing wrong with you as far as an accountant.  You are very capable. . . . However, you rub me the wrong way.  I don't like you because you smoke and I am not real crazy about your age."

> "[The next day] I told [Nary] I wouldn't even venture a guess as to me getting the position because of the interview that had gone on between Mr. Marconcini and myself the night before." Tr. Vol. I, p. 31-32.

4

anyone, including Grizzle, on the basis of age.[6]  No formal complaint was registered by Grizzle following the appointment of Latiolais addressing her speculation that perhaps the factor of her age figured into the decision to appoint transferee Latiolais as her supervisor.

From approximately April of 1989 until February of 1990, Grizzle, Latiolais and Loretta Scott ("Scott"), a younger co-worker who performed the same function at Travelers as plaintiff, all shared the same small office.  In July 1989, Travelers switched to a new computer system on which plaintiff lacked proficiency, with the result that she made many ledger entry errors.  In the summer of 1989, Grizzle complained to Travelers' Director of Internal Accounting, Beverly Snyder ("Snyder"),[7] that she was subjected to increased surveillance and scrutiny of her work by Latiolais, while Scott was not.  She also complained that Latiolais and Scott were not speaking to her, and that she was given insufficient computer training for the new system, and further speculated that her co-

---

[6]Grizzle's precise testimony regarding her conversation with Goltz follows:

> "Mr. Goltz was telling me that he made Kent supervisor due to the fact when he was finance director and he went to New Orleans, Kent had all of his account balances analyzed and I told him that I didn't think that I would ever move on with the company as I hadn't in the past because of my age."

> "He [Goltz] lost his composure for a second, and then he assured me that he would never treat me or promote or not promote anyone on the basis of age." Tr. Vol. I, p. 47-48.

[7]The hierarchy at Travelers was as follows: Latiolais reported to Snyder, who reported to Goltz.

workers disliked her because of her age.  According to Grizzle, Snyder responded there was nothing that Grizzle could do about it because she was not over the age of 55.[8]  Snyder denied making that statement and also testified she did not know that the ADEA prohibits age discrimination against people aged 40 and above.

In July 1989, Grizzle received her first written warning from Latiolais regarding her lack of productivity and her ledger entry mistakes.  Travelers maintained two personnel files on Grizzle, and Latiolais eventually compiled a "four-inch-thick" binder documenting her errors.  At trial Grizzle admitted that, like everyone else in the department, she made errors.  She further acknowledged that her performance was sub par.  Grizzle explained

---

[8]The entirety of Grizzle's trial testimony regarding her discussion with Snyder, follows:

> "I had gone to her [Snyder] and I told her that I did not think that it was fair the way I was treated in the Department -- that I was not spoken to, that I was not given training, that I was not included in what was going on in the books and so forth of the company, the attitude that was well known among all the supervisors and officers in the company, and that I felt like, you know, something should be done to help remedy the situation where we could work together as professional human beings."

> ". . . she told me that I was a bad fit; that Kent and I mixed like oil and water; Loretta didn't like me; and since I just live in an apartment, why didn't I just find me another job. . . . During the course of the conversation, I told her that I didn't think it was fair the way that I was being treated, and that I thought that I was being treated that way to a great extent due to my age. And she told me that there was nothing that I could do about it because I was not over the age of 55.
> Tr. Vol. I, pp. 71-72.

the plethora of documentation as to her admittedly sub par performance by stating that Latiolais and Scott had augmented their evidence of her errors by taking copies of her ledger printouts directly from the printer before she had a chance to proofread them. She further testified that she received inadequate training on the new computer system and that the system had "bugs." It was Grizzle's impression that the problems she encountered in relating to her co-workers justified her admittedly poor performance. Grizzle further complained she was not advised of several memos documenting her errors and poor performance, which were placed in her personnel file by Latiolais.

The evidence was, however, to the effect that: (1) Grizzle had sufficient computer skills to complete the task of entering journal entries into the computer and checking them against the general account ledger; and (2) as to the computer system itself, all employees of Travelers worked on the same system, and all, but Grizzle, managed to perform their assigned tasks adequately. Moreover, Grizzle admitted, that upon her request, Latiolais reallocated plan assignments between herself and her co-worker Scott. Further, Grizzle acknowledged that Latiolais did his level best to help both herself and Scott with bank reconciliations and that he in fact did Grizzle's because she was so far behind in her accounting work.

In December of 1989, Grizzle was given another written warning by Latiolais and in January 1990 was placed on "final warning." Documentation of her errors continued throughout this period. On

February 16, 1990, Latiolais told Grizzle that her performance had not improved and that she was discharged. Grizzle was only 44 years old on the date of her discharge and simple math admits that at the time discharge, Grizzle was only two years older than she was at the time Travelers' made the decision to hire her.

Latiolais, Goltz, and Snyder, each of whom are approximately 10 years younger than Grizzle, participated in making the decision to fire her. She was replaced by a 23-year-old recent college graduate. On March 16, 1990, she filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging Travelers discriminated and retaliated against her on the basis of her age. That was the first formal complaint made by Grizzle referencing age discrimination in the employment context. During the six-month period of Grizzle's documented and admittedly sub par performance of her job with Travelers (i.e., July 1989 through February 16, 1990), Grizzle registered no formal complaint with respect to any age discrimination on the job.

B. Evidentiary Rulings at Issue

The trial judge excluded the testimony of Grizzle's witness, Sandra Clark ("Clark"), a former employee of the EEOC, who was also employed as plaintiff's counsel's paralegal. Clark would have testified as to plaintiff's lost earnings. The trial judge also excluded evidence of Travelers' net worth. Two of Grizzle's co-workers, defense witnesses Natalie Decker ("Decker") and Cary Burton ("Burton"), whose addresses were not disclosed in the pre-trial order, were permitted to testify notwithstanding the

objection of plaintiff's counsel. Decker and Burton testified generally that Grizzle was a gossip, had criticized Latiolais' abilities as a supervisor, and had called one co-worker a "sex maniac." However, the judge prevented these witnesses from answering questions about racist and homophobic comments allegedly made by Grizzle. The sum and substance of her co-workers testimony, which testimony was corroborated by her supervisor Latiolais, was that Grizzle did not pay sufficient attention to her work on account of her frequent breaks, which time was spent engaged in activity (i.e., "gossiping") which was counter-productive.

C. Traveler's Closing Argument

During his part of Travelers' shared closing argument, Travelers' counsel David Kitner ("Kitner") repeatedly personalized it employing language such as:

> "I am asking myself questions";
> "I hope that you came to the same conclusion I did";
> "I agree with that and I think that everyone here ought to".

> "Now, I have been sitting here with Paula, and . . . I kind of felt like I am the seventh juror right over here in this chair over here, because I am hearing the evidence; I am able to listen to it because I am not caught up on the trial so much, objecting and things like that. And I am asking myself questions."

> "You need to send a message to people like Ms. Grizzle that you don't come into the courthouse and take up this court's time and the jury's time in cases like this."

Grizzle's counsel made a request to approach the bench during the middle of Travelers' close, but did not apprise the trial judge of the reason for her request, and the request was denied. There was no timely objection to Kitner's closing argument. Only at the

9

conclusion of Travelers' closing argument did plaintiff's counsel formally object to Kitner's remarks and request for a specific curative instruction, which request the trial judge denied.

II. ANALYSIS

A. JNOV

The jury found that Travelers terminated Grizzle's employment in retaliation for her opposition to and complaints about alleged age discrimination, in violation of the ADEA.[9] The trial court set aside this verdict in a one-page order without detailing the reasons for its ruling.

The standard of review for motions for directed verdict and for JNOV was succinctly set out in Boeing Co. v. Shipman, to wit:

> [T]he court should consider all of the evidence--not just that evidence which supports the non-mover's case--but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict,

---

[9]The ADEA section dealing with retaliatory discharge provides: "(d) Opposition to unlawful practices . . . It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or . . . has made a charge . . . under this chapter." 29 U.S.C. § 623(d) (1988).
Section 623 of the ADEA defines the following employer practices as "unlawful":
(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
(3) to reduce the wage rate of any employee in order to comply with this chapter.

10

granting [JNOV] is proper. On the other hand, if there is substantial evidence opposed to the motion[], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, [JNOV] should be denied. . . . [I]t is the function of the jury as the traditional finder of facts, and not the court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

411 F.2d 365, 374-75 (5th Cir. 1969)(en banc).

Grizzle challenges the JNOV, asserting that although her job performance was poor, there was other evidence from which the jury could find a retaliatory motive for her discharge. Travelers contends that Grizzle has failed to produce any evidence from which a reasonable jury could conclude that her termination was more likely caused by a retaliatory motive, rather than by her admittedly poor performance.

Thus we must determine whether Grizzle failed as a matter of law to prove retaliation. A plaintiff establishes a prima facie case of ADEA retaliation by demonstrating that: (1) she engaged in activity protected by the ADEA; (2) an adverse employment decision occurred; and (3) there was a causal connection between the protected act and the adverse employment decision.[10] Once the prima facie case is established, the burden of producing some non-discriminatory reason falls upon the defendant.[11] If the defendant

---

[10]Shirley v. Chrysler First, Inc., 970 F.2d 39, 42 (5th Cir. 1992); see also, Jones v. Flagship Int'l, 793 F.2d 714, 724 (5th Cir. 1986)(similarly worded and interpreted Title VII retaliation provision), cert. denied, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987).

[11]Shirley, 970 F.2d at 42.

11

demonstrates such, the employee then assumes the burden of showing that the reasons given by the defendant were a pretext for retaliation.[12] However, when a case has been fully tried on the merits, as this one has, the adequacy of a party's showing at any particular stage of the burden-shifting process is not the primary issue.[13] Rather, the appellate court reviewing a JNOV looks to see if the overall record contains evidence upon which a reasonable trier of fact could have concluded as the jury actually did.[14] In summary, the ultimate issue is whether the there was sufficient evidence for a reasonable finder of fact to conclude that the official reason for Grizzle's discharge was "pretextual", and that the true reason therefor was retaliation for her complaints of age discrimination.

The burden of proof herein was on Grizzle to demonstrate that her discharge was more likely based on retaliation for her complaints of illegal discrimination, and not caused by her inability to perform her assigned work or her co-workers' dislike of her.[15] Further, in order to prove her claim for retaliatory

---

[12]Id.

[13]Molnar v. Ebasco Const., Inc., 986 F.2d 115, 118 (5th Cir. 1993)(citing Walther v. Lone Star Gas Co., 952 F.2d 119, 122-23 (5th Cir. 1992)).

[14]Id. (citing Elliot v. Group Medical & Surgical Service, 714 F.2d 556, 564 (5th Cir. 1983), cert. denied, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984)).

[15]See, e.g., Little v. Republic Refining Co., 924 F.2d 93, 96 (5th Cir. 1991)(discharge based on jealousy not actionable under the ADEA); Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1571 (7th Cir. 1989)(evidence that employer "hard-hearted" in being unsympathetic to adjustment problems of employee failed to

12

discharge, Grizzle was required to demonstrate that "but for" the protected activity, she would not have been discharged.[16]

According to Grizzle, her immediate supervisor Latiolais was largely responsible for the decision to discharge her. Although Goltz, Snyder and Latiolais participated in the decision to terminate her, it was Latiolais her direct supervisor who had the final authority to terminate her employment and did so, in fact, on February 16, 1990. Yet, Grizzle made no complaints of discrimination to Latiolais.

In this vein, Grizzle produced no direct evidence of retaliation. The "protected activity" asserted by Grizzle consisted of three "complaints" of age discrimination, to wit: (1) her discussion with Nary regarding Marconcini's remarks in the fall of 1988;[17] (2) her discussion with Goltz regarding his decision to appoint Latiolais as her supervisor in approximately April of 1989;[18] and (3) her discussion with Snyder during the summer of 1989.[19] Grizzle introduced no evidence which would suggest that either Goltz or Snyder advised Latiolais of the precise nature of her "complaints" to them. Only impermissible speculation could

_____

establish pretext that firing not due to performance problems).

[16]Shirley, 970 F.2d at 43 (citing Jack v. Texaco Research Ctr., 743 F.2d 1129, 1131 (5th Cir. 1984)(interpreting similarly worded Title VII retaliation provision).

[17]See supra note 5.

[18]See supra note 6.

[19]See supra note 8.

13

account for a finding that Latiolais' decision to terminate Grizzle was causally connected to her "complaints."

Reviewing the entire record, we find that Grizzle has introduced no evidence which would support a reasonable jury finding of retaliatory motive without engaging in impermissible speculation. There was no evidence of a hostile reaction to any of her alleged complaints. As heretofore noted, Grizzle's initial complaint to Nary about Marconcini's remarks resulted in her being given a raise and promotion. This certainly does not constitute retaliation.

The only evidence supporting Grizzle's claim regarding her second complaint, the April 1989 conversation with Goltz, was Grizzle's own self-serving generalized testimony stating her subjective belief that discrimination occurred. Such is simply insufficient to support a jury verdict in plaintiff's favor.[20] Moreover, approximately ten months elapsed between Grizzle's complaint to Goltz and her discharge. Although this lapse of time is, by itself, insufficient to prove there was no retaliation,[21] in the context of this case it does not support an inference of retaliation, and rather, suggests that a retaliatory motive was highly unlikely.

The focus of Grizzle's discussion with Snyder during the summer of 1989, when plaintiff was "in the throes" of attempting to

---

[20]Elliot, 714 F.2d at 564; Little, 924 F.2d at 96.

[21]See Shirley, 970 F.2d at 43-44 (fourteen months between filing of EEOC complaint and discharge "not conclusive" as to finding of no retaliation).

14

adjust to Travelers' new computer system, was that she was being unfairly treated by co-workers. The "unfair treatment" was essentially enhanced supervision of her work, with which she admittedly was experiencing great difficulty. In light of such evidence, only rank speculation could account for a verdict in favor of Grizzle on her retaliatory discharge claim. In order to find as the jury did in the case at bar, the evidence of the coincidence of the installation of Traveler's new computer system, Grizzle's drop in productivity and the onset of her poor performance, and enhanced supervision of Grizzle on the job, had to be viewed as pure happenstance. Even Grizzle herself admitted some causal connection between the installation of a new computer system with her poor performance on the job.

The record is devoid of evidence which would support a finding of causal connection between an isolated comment expressing Grizzle's "perceptions" in the summer of 1989 and her discharge over five months later in mid-February of 1990 based upon a mountain of paper in her personnel file documenting her poor work performance throughout that entire period. Again, Grizzle herself acknowledged such poor performance as the true state of affairs. Even assuming as true, Grizzle's allegation that her mistakes were caused by the oppressive conduct of Latiolais and Scott, such is not actionable under ADEA unless it can be proven to be the result of illegal discrimination or, in this case retaliation for engaging in protected conduct. There is no evidence of such in this case, and thus, no evidence of "but for" causation of retaliation.

15

As we observed in Elliot:

> [e]ven had the reasons articulated here been frivolous or capricious, had they been the genuine cause[] of [this] discharge[] they would have defeated liability under the ADEA. . . . [T]hat statute proscribes only one reason for discharge: age. One who offers a frivolous or capricious reason, however, does so at heavy risk that it will be discounted. Conversely where, as here, the reasons articulated are rational ones, the objective truth of which is not seriously disputed, the burden of establishing them as pretextual is a heavy one indeed. . . . [I]t is not discharged by general avowals of belief, however, sincere, that age--rather than an established adequate reason--was the real reason for the termination. More is required, perhaps a successful statistical demonstration by expert testimony, perhaps proof that others similarly situated were not discharged.[22]

We observe that judgment notwithstanding the verdict is appropriate in the employment retaliation context when the circumstantial evidence is such that the jury could improperly draw inferences that are mere speculation.[23] We find such to have occurred in this case, and thus, that the district court correctly applied Boeing.

B. Traveler's Closing Argument

Grizzle contends Travelers' counsel made improper statements of personal opinion during closing argument, and that the court's refusal to provide a specific curative instruction entitles her to a new trial on her intentional infliction of emotional distress claim. Travelers contends that the remarks were innocuous, and that the judge's failure to provide a specific curative instruction

---

[22]Elliot, 714 F.2d at 567.

[23]Williams v. Cerberonics, Inc., 871 F.2d 452, 458-59 (4th Cir. 1989).

16

was, at most, harmless error. Although injecting personal belief into argument is improper, verdicts have been upheld despite the presence of similar remarks by counsel.[24] Even experienced trial lawyers have been known to occasionally and inadvertently use the word "I" during closing arguments. A review of closing argument on behalf of Grizzle reveals that plaintiff's counsel, likewise, improperly injected personal feeling, although to a lesser extent.[25]

In reviewing a closing argument that has been challenged for impropriety, the appellate court must consider the jury charge and any corrective measures taken by the trial court.[26] Whereas some of the remarks of counsel should more appropriately have been phrased "the evidence shows" rather than "I believe", taking the argument as a whole, the trial judge's failure to admonish counsel during his part of the closing argument does not in this case

---

[24]See, e.g., Canada Dry Corp. v. Nehi Beverage Co., 723 F.2d 512, 526-27 (7th Cir. 1983)(vouching for honesty of president of company based on personal friendship with counsel and counsel's statement of his own belief in the correctness of his client's case not reversible error when comments were a very brief portion of argument and trial court charged jury that statements of counsel were not evidence); see also Bankers Trust Co. v. Publicker Indus., Inc., 641 F.2d 1361, 1366 (2nd Cir. 1981)(use of the word "you" ten times in six sentences was not impermissible personal appeal to jury, but was appeal to juror's common sense).

[25]For example, Grizzle's counsel made both "send a message" and "conscience of the community" arguments and referred to size of the corporate defendant, suggesting five million would get Travelers' attention.

[26]Westbrook v. General Tire and Rubber Co., 754 F.2d 1233, 1238 (5th Cir. 1985).

amount to plain error.[27]

Grizzle challenges only the part of the jury's verdict denying her intentional infliction of emotional distress claim, and yet, Grizzle's proof of intentional infliction of emotional distress falls far short of that required to state a claim for such under our prior cases.

To prevail on a claim for intentional infliction of emotional distress, Texas law requires that the following four elements be established: (1) that the defendant acted intentionally or recklessly; (2) that the conduct was 'extreme and outrageous'; (3) that the actions of the defendant caused the plaintiff emotional distress; (4) that the emotional distress suffered by the plaintiff was severe.[28]

---

[27]Moreover, both at the beginning of the trial and in the jury charge, the trial judge instructed that statements and arguments of counsel are not evidence.

[28]Wilson v. Monarch Paper Co., 939 F.2d 1138, 1142 (5th Cir. 1991). In Wilson we stated:

> 'Extreme and outrageous conduct' is an amorphous phrase that escapes precise definition.' In Dean v. Ford Motor Credit Co., supra, however, we stated that
> > [l]iability [for outrageous conduct] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community . . . . Generally, the case is one in which a recitation of the facts to an average member of the community would lead him to exclaim, 'Outrageous.'
> . . . [L]iability 'does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities . . . . There is no occasion for the law to intervene in every case where someone's feelings are hurt.'

Id. (citations omitted).

18

The conduct at issue in the case at bar can hardly be regarded as "extreme and outrageous." Without question, the evidence regarding the conduct of Grizzle's co-workers at Travelers defies characterization as conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[29]

Upon reviewing Travelers' closing argument in its entirety, we conclude that the comments by Travelers' counsel were unlikely to have affected the verdict, and do not justify grant of a new trial. Travelers' closing remarks have not affected any substantial right of Grizzle's, and could not have had an effect on the jury verdict considering the complete failure of proof of "extreme and outrageous" conduct, an essential element of Grizzle's IIED claim.

C. Evidentiary Rulings

Now turning the to the evidentiary rulings of the trial court, Grizzle raises as error the district court's failure to permit Clark, a paralegal employed by plaintiff's counsel, to testify as to plaintiff's lost wages as derived from the EEOC's "pay calc" computer program. Clark was listed in the pre-trial order as a "fact witness," was not designated as an "expert witness", and was not deposed by Travelers. The trial court's reason for excluding Clark's testimony included that: such testimony would invade the province of the jury; that an expert was required to present evidence as to back pay; and that it would be difficult to test the

---

[29]Id.

19

credibility of an employee of plaintiff's counsel. However, plaintiff's counsel was permitted during closing argument to present these backpay calculations and Grizzle also testified regarding her damages during her direct examination.

Essentially, Grizzle contends that in cases filed by low to medium income persons, involving a small amount of lost wages and no front pay, expert testimony is unnecessary and not economically feasible, and thus testimony by an employee of counsel should be permitted. This is a non-sequitur. It may be that in such cases expert testimony is unnecessary to apprise the jury of plaintiff's lost wages. A plaintiff may be able to testify to such amounts in simple cases. Of course, excessive cost should be no excuse for failure to hire an expert in a difficult case where a fee shifting statute, such as the one before us, permits the prevailing party to obtain certain of its costs from the loser. But none of this concern about whether to introduce plaintiff's or an expert's testimony translates, however, into the rule advocated by Grizzle: that testimony by an employee of counsel should be permitted. Permitting testimony by an employee of an attorney who is assisting in the preparation and prosecution of the case is tantamount to permitting testimony by one's attorney. For that reason, we find no error.

Grizzle asserts it was error for the trial judge to permit testimony of two defense witnesses, Decker and Burton, who were Grizzle's co-workers during her tenure at Travelers. Grizzle argues "unfair surprise" in that these witnesses' addresses were

20

not disclosed in the pre-trial order and counsel was without sufficient information required to locate and depose them. We disagree.

The trial court did not abuse its discretion admitting the testimony of Grizzle's co-workers. Defense witnesses, Burton and Decker were disclosed in the pre-trial order, albeit sans addresses. Both were employees of Travelers up to and including the time of trial, and yet, Grizzle's counsel made no attempt to contact Travelers' counsel for the purpose of setting their discovery depositions. The circumstances are such that their testimony at trial cannot be aptly characterized as "unfair surprise." It is undisputed that both Decker and Burton were identified as Travelers' employees and potential witnesses months prior to trial.

Finally, Grizzle contends that it was error to exclude evidence of Travelers net worth,[30] which she argues was relevant to her punitive damages claim. Travelers counters that any error, with respect to the two aforesaid evidentiary rulings, was harmless.

Failure to permit evidence of Travelers' net worth in the aforesaid proffered form was not an abuse of discretion, particularly in light of the fact that the jury found for the

---

[30]Plaintiff's Proposed Exhibit 38 which included, inter alia, Forbes Directory of America's Largest Corporations, Standard & Poors listing for Travelers Corp., New York Stock Exchange Stock Report for Travelers Corp., pertained to Travelers Corp., and not to the defendant in this case, Travelers Health Network, Inc.

Travelers on the intentional infliction of emotional distress claim to which such punitive damages were applicable.

In summary, the aforesaid evidentiary rulings are matters which are properly left to the sound discretion of the trial judge. Absent any indication of undue prejudice, which we do not find here, the trial court's rulings should not be disturbed. Considerable deference is to be accorded to the district court's evidentiary rulings and a ruling which admits or excludes evidence does not require reversal unless a substantial right of a party is affected.[31] Judged against this standard, the aforesaid evidentiary rulings do not require reversal.

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[31]Mills v. Beech Aircraft Corp., Inc., 886 F.2d 758, 762 (5th Cir. 1989).