**Alise KAPLAN, Plaintiff,**

v.

**CITY OF ARLINGTON, Defendant.**

No. 4:01–CV–134–A.

United States District Court,
N.D. Texas,
Fort Worth Division.

Feb. 4, 2002.

William C Isbell, Law Office of William C Isbell, Dallas, TX, Fritz Barnett, Barnett & Craddock, Houston, TX, for Alise Kaplan.

Frank Waite, City of Arlington, City Attorney's Office, Arlington, TX, for City of Arlington.

### AMENDED MEMORANDUM OPINION and ORDER

McBRYDE, District Judge.

This Amended Memorandum Opinion and Order replaces in its entirety the Memorandum Opinion and Order in this action the court signed January 31, 2002.

Came on for consideration the motions of defendant, City of Arlington, for judgment on the pleadings and for summary judgment as to the new claims raised in the first amended complaint. The court, having considered the motions, the responses of plaintiff, Alise Kaplan, the reply, the record, and applicable authorities, has concluded that the motions should be granted as provided herein.

## I.

### Plaintiff's Amended Complaint

Plaintiff filed her original petition in the 141st District Court, Tarrant County, Texas, on January 8, 2001[1]. By an order signed January, 28, 2002, the court granted plaintiff's out of time motion to file an amended complaint. The factual allegations of the amended complaint[2], are, in their entirety, as follows:

5. Alise Kaplan was employed by the City of Arlington in 1984, and faithfully and loyally performed her duties until she was discharged January 2000. She received regular promotions and merit pay increases. She was a good employee. She began to suffer medical problems in part because of her work environment. She sought and received treatment. Her medical condition was well known to her supervisors and other employees.

6. Once her medical condition became known to her supervisors, it then became common knowledge among the staff. She began to be ridiculed and harassed by her supervisors and co-workers. Her supervisors began to pretextually undermine her work, and unfairly criticized her in an attempt to cause her greater emotional problems.

She filed grievances regarding the defendant's conduct as the city required. She was then ordered by the city to cease filing any further grievances. Although she had a due process right to receive full and fair hearings and file any grievance she wished, she was terminated in January of 2000 in part because she filed grievances complaining of her work condition.

7. Additionally, in April of 1999, plaintiff brought to the attention of her supervisor the fact religious literature was posted on the bulletin board of the Engineering Department of the City of Arlington. She was following correct policy and procedure. When she brought this to her supervisor's attention, she was questioned as to whether she believed in Jesus or not. Alise Kaplan is Jewish, a fact well know [sic] to the defendant and its employees. After that, as a part of her annual evaluation, she was criticized for raising the issue of the religious documentation on the bulletin board and this was used as a basis for a poor evaluation of what otherwise would have been made. As a consequence, Alise Kaplan filed a grievance which was in part the basis of her termination. In fact, she filed several grievances all stemming from the defendant's retaliation against her on the basis of her religion. All conditions precedent have been performed or have occurred.

Am. Compl. at 1–2.

Plaintiff then alleged that those facts give rise to causes of action for intentional infliction of emotional distress, wrongful termination, denial of due process rights, and wrongful retaliation in violation of 42 U.S.C. § 2000–e[3] [sic].

---

1. Defendant removed the matter to this court by a notice of removal filed February 9, 2001.

2. The amended complaint added the factual allegations found in paragraph 7.

3. The amended complaint added the retaliation cause of action.

## II.

*Defendant's Rule 12(c) Motion for Judgment on the Pleadings*

### A. The Grounds of the Motion

Defendant's motion for judgment on the pleadings seeks dismissal of certain claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Defendant asserts that it enjoys immunity from plaintiff's claims for intentional infliction of emotional distress and wrongful termination as they necessarily are asserted under Texas law. As to plaintiff's due process claim, defendant asserts that plaintiff has not pleaded the elements of a claim under 42 U.S.C. § 1983. Defendant filed its Sec. 12(c) motion prior to plaintiff's request for leave to amend the complaint; therefore, the motion concerns only the three claims raised in plaintiff's original petition.

### B. Rule 12(c) Standard of Review

Rule 12(c) provides, in pertinent part, that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." The motion is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts. *See Hebert Abstract Co. v. Touchstone Props., Ltd.,* 914 F.2d 74, 76 (5th Cir.1990). The court may consider as part of the pleadings any documents referred to in the plaintiff's complaint that are central to the plaintiff's claims. *See Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498–99 (5th Cir.2000). The standard for reviewing a Rule 12(c) motion is the same as for a motion under Rule 12(b)(6). *See Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). To withstand a motion for judgment on the pleadings,

the complaint must contain either direct allegations on every material point necessary to sustain a recovery ... or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial. [A] statement of facts that merely creates a suspicion that the pleader might have a right of action is insufficient. Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief. The court is not required to conjure up unpled allegations or construe elaborately arcane scripts to save a complaint. Further, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion [for judgment on the pleadings].

*Campbell v. City of San Antonio,* 43 F.3d 973, 975 (5th Cir.1995) (internal citations & quotations omitted).

### C. Intentional Infliction of Emotional Distress Claim

■ Plaintiff argues that her claim for intentional infliction of emotional distress is brought under the Texas Commission on Human Rights Act ("TCHRA"), Tex. Labor Code 21.001–21.306. Such a claim, however, is beyond the scope of the TCHRA and arises solely under Texas common law. *See McCormick v. El Paso Elec. Co.,* 996 S.W.2d 241, 243 n. 2 (Tex.App.El Paso 1999, no pet.) (citing *Twyman v. Twyman,* 855 S.W.2d 619 (Tex.1993)). Defendant enjoys sovereign immunity from such a claim. *See Gillum v. City of Kerrville,* 3 F.3d 117, 123 (5th Cir.1993); *City of Waco v. Hester,* 805 S.W.2d 807, 810–12 (Tex. App.Waco 1990, writ denied). As a matter of law, therefore, plaintiff's claim for intentional infliction of emotional distress must be dismissed.

### D. *Wrongful Termination Claim*

■ Defendant correctly points out that, to the extent that plaintiff's claim for wrongful termination is based on Texas common law, it, too, is barred by sovereign immunity. *See id.* In an apparent effort to avoid this pitfall, plaintiff asserts in her response that the claim labeled "Wrongful Termination" is actually a claim arising under the TCHRA (even though neither of her pleadings mentions the TCHRA).

To assert a claim under the TCHRA, a plaintiff must first exhaust her administrative remedies by completing an administrative process. *See Schroeder v. Texas Iron Works, Inc.,* 813 S.W.2d 483, 488 (Tex.1991). Once a plaintiff completes the administrative process and receives her right to sue notice, her claim under the TCHRA is ripe for pursuit in court. *See* Tex. Labor Code § 21.254. Once a claim is ripe, plaintiff must file suit within 60 days. *See id.*

Ordinarily a plaintiff bringing a claim under the TCHRA would indicate that fact in her petition or complaint. As noted above, plaintiff's pleadings contain no such indication. Such an omission may be excused and a plaintiff may allege a TCHRA claim without specifically mentioning the TCHRA if plaintiff pleads her claim within the 60 day period following receipt of the notice of right to sue and if the facts specifically alleged in that pleading are sufficient to state a claim under the TCHRA. *See King v. Texas Dep't of Human Servs.,* 28 S.W.3d 27, 31–32 (Tex.App.Austin 2000, no pet.). Plaintiff's complaint does not allege facts that demonstrate that she satisfied those require-

ments.[4] Her claim for wrongful termination, therefore, must be dismissed.

### E. *Denial of Due Process Rights Claim*

■ Plaintiff's third cause of action is labeled simply "denial of due process rights." Defendant asserts that plaintiff's pleading does not state a cause of action under 42 U.S.C. § 1983, which is the sole statutory basis to enforce such a claim against a municipality. *See Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Fifth Circuit explained the pleading requirements for holding a municipality liable under Section 1983 as follows:

> [A] plaintiff must initially allege that an official policy or custom "was a cause in fact of the deprivation of rights inflicted." *Leffall v. Dallas Indep. Sch. Dist.,* 28 F.3d 521, 525 (5th Cir.1994). To satisfy the cause in fact requirement, a plaintiff must allege that "the custom or policy served as the moving force behind the [constitutional] violation" at issue, *Meadowbriar Home for Children, Inc. v. Gunn,* 81 F.3d 521, 533 (5th Cir.1996), or that her injuries resulted from the execution of the official policy or custom, *Fraire v. Arlington,* 957 F.2d 1268, 1277 (5th Cir.1992). The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts. *Id.* at 1278.

*Spiller v. City of Texas City, Police Dep't,* 130 F.3d 162, 167 (5th Cir.1997). While plaintiff need not meet the heightened pleading requirements of Rule 9 of the Federal Rules of Civil Procedure, she must

---

**4.** If the court were to convert defendant's Rule 12(c) motion into a motion for summary judgment by relying on evidence outside of the pleadings, that evidence would show that plaintiff's right to sue notice was issued on or about July 30, 2001, i.e. some seven months *after* plaintiff's original petition was filed. At the time her original petition was filed, it could only be construed as arising under Texas common law as no cause of action under the TCHRA had yet accrued. Further, plaintiff did not amend her pleading within 60 days after receiving her notice of right to sue.

plead sufficient facts to put defendant on notice of the grounds of the claim. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Specifically, plaintiff must plead facts showing (1) existence of a policy or custom, (2) that the city's leaders actually or constructively knew of its existence, (3) a constitutional violation actually occurred, and (4) that the policy or custom served as the moving force behind the violation. *See Meadowbriar,* 81 F.3d at 532–33. Plaintiff's pleading simply does not meet these requirements. Her due process claim must, therefore, be dismissed.

## III.

### *Defendant's Motion for Summary Judgment*

A. *The Grounds of the Motion*

Subsequent to defendant's filing of its motion for judgment on the pleadings, plaintiff sought leave to amend to add claims under the Americans with Disabilities Act (the "ADA") and for retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"). While plaintiff's motion was pending, defendant filed a motion for summary judgment as to the proposed retaliation claim, which had not been addressed by its motion for judgment on the pleadings. The grounds of the second motion are that (1) plaintiff's religious discrimination claim is objectively unreasonable, and (2) that plaintiff's actions were not protected under Title VII because she "went too far." Further, defendant asserts in its reply that plaintiff neither pleaded a claim under the ADA nor satisfied the conditions precedent to the making of such a claim.

B. *Applicable Summary Judgment Principles*

A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of showing that there is no genuine issue of material fact. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party opposing the motion may not rest on mere allegations or denials of pleading, but must set forth specific facts showing a genuine issue for trial. *Anderson,* 477 U.S. at 248, 256, 106 S.Ct. 2505. To meet this burden, the nonmovant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]." *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994). An issue is material only if its resolution could affect the outcome of the action. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment. *Simmons v. Lyons,* 746 F.2d 265, 269 (5th Cir.1984).

The standard for granting a summary judgment is the same as the standard for a directed verdict. *Celotex Corp.,* 477 U.S.

at 323, 106 S.Ct. 2548. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita,* 475 U.S. at 597, 106 S.Ct. 1348.

## C. *Undisputed Summary Judgment Evidence*

The following is an overview of evidence pertinent to the motion for summary judgment that is undisputed in the summary judgment record:

Plaintiff began her employment with the defendant in 1984. Her employment record was relatively uneventful until sometime shortly before Easter in 1999 when plaintiff noticed a poster on the engineering department bulletin board that advertised that a movie called "Jesus" would be shown in one of the conference rooms on a certain date. Plaintiff reported the poster to her supervisor based on her belief that city policy prohibited any religious symbolism in the workplace. She was not personally offended by the poster. When she reported the poster, her supervisor, David Wynn ("Wynn"), asked her whether she believed in Jesus, to which she responded that she was offended by the personal nature of the question. Wynn never again asked plaintiff about her religion. After that, between June 1999 and October 1999, plaintiff filed more than a dozen written grievances.

Plaintiff filed four separate grievances[5] during the months of June and July 1999[6]. They solely concerned allegations that plaintiff's co-workers were making unpleasant statements[7] about her such as "[plaintiff] has no friends in the department," *see, e.g.,* Def.App. at 63, and that such unpleasantness was creating, and had created, a stress based medical condition. In those complaints, plaintiff requested that the offending parties apologize or provide assurances that the behavior would not happen again.

On August 2, 1999, plaintiff received her annual evaluation report from her supervisor, Wynn. While she received an overall employee rating of "Effective[8]," plaintiff objected to the rating of "Needs Development" in the sub-category labeled "Teamwork" and the comment associated with the rating, which said:

Alice has a tendency to disrupt operations of the department by discussing with co-workers policies and decisions she disagrees with. Examples of this are the advertisement for the showing of the movie 'Jesus' in the Engineering Conference Room and my request for only certain people to call the hospital for status updates on [a co-worker].

Def.App. at 58. In response, under the "Employee Comments" section of the report, plaintiff made the following statement:

"Teamwork"—There is non work related information on this review along with falsification of information. The operations of the City are never disrupted and David tries to control whom I speak to [and] what it is about. This review is to *only* contain pertinent information rela-

---

5. Plaintiff's grievances follow the same pattern. She first summarizes the complained behavior. Second, she lists the city rules or regulations that she believes have been violated. Third, she sets out "specifications" detailing that actions that she believes were illegal or wrongful. Finally, she recommends what she believes would be a "just and fair solution."

6. The grievances were dated June 16, June 18, July 1, and July 12.

7. The latter complaints also grieved regarding how plaintiff's supervisor's conducted the resolution of the initial claim.

8. The evaluation form includes three possible overall employee ratings, "Highly Effective," "Effective," and "Needs Development."

tive to my work performance. This has not been done and is not a fair review, nor is it a correct one.

*Id.* at 60.

On August 20, 1999, plaintiff grieved that (1) Wynn "failed to control religious symbolism" posted on a department bulletin board, (2) he knowingly placed "racial and religious discriminatory remarks" on her August 2, 1999, performance evaluation, (3) by so doing he abused the performance evaluation system, (4) he conspired with others to get approval to include the remark, (5) by including the remark he failed to follow instructions not to harass her, (6) that he "has for years conspired, and continues to conspire, to bring discredit upon [plaintiff]," and (7) by including the remark in her performance evaluation he is attempting "to terminate [plaintiff's] employment because he resents my religious beliefs and ethnicity as a Jew." Def.App. at 74–75. Plaintiff then demanded Wynn be (1) suspended or terminated, (2) ordered to undergo two or more weeks of special counseling, and (3) ordered to participate in official minority activities of the city. *Id.* at 75.

Plaintiff filed another grievance on August 20, 1999, in which she alleged that (1) Bill Verkest ("Verkest"), the head of the department, had on July 7 and 8, 1999, promised to stop any harassment directed at plaintiff in exchange for her withdrawing two active and three inactive grievances, (2) he failed to correct the harassing inaccuracies contained in her August 2, 1999, performance evaluation in that she received a "good" after having been told previously that her work was "excellent," (3) he had allowed others to "socially, religiously and racially discriminate against [plaintiff] because [she is] a member of the Jewish race and faith," and (4) he sanctions Bible study meetings on city property. *Id.* at 81–82. Plaintiff requested that Verkest be required to attend "special

counseling" and training of not less than two weeks duration. *Id.* at 82.

By yet another grievance filed August 20, 1999, plaintiff complained that when Wynn noticed that she was working at her desk "on the final documentation for nine (9) grievances that were turned into [sic] David Wynn [that] morning," he directed that a printer be removed from her office. *Id.* at 83. Plaintiff grieved that this action decreased her ability to do her job in a timely manner and that the action was taken in retaliation for her preparing grievances on the previous day. Plaintiff requested that Wynn provide justification for the removal of the printer.

On August 20, 1999, plaintiff grieved that Keith Melton ("Melton"), another supervisor, conspired with Wynn and approved the inclusion of "religiously prejudiced statements" on her performance evaluation and that by doing so Melton disobeyed instructions from Verkest to "stop the job harassment." *Id.* at 72. The comment in question regarded plaintiff's objection that the presence on city property of a poster for a movie about Jesus violated city policy. Plaintiff further grieved that Melton allowed Wynn to include false information on an official city document, i.e. by not giving her an "excellent" rating. Plaintiff requested that Melton undergo "special counseling and training" of not less than two weeks total duration. *Id.*

In late August Don Lackey ("Lackey"), a human resources specialist, was assigned by the director of human resources to investigate plaintiff's grievances. On September 2, 1999, Lackey phoned plaintiff to set up a fact gathering meeting regarding her grievances. Plaintiff informed him that she was busy and would try to call him by the end of the next week. On that same day, Lackey sent plaintiff a brief memo stating that the investigation could

not begin until he interviewed her and that "[d]ue to the nature of your complaint it is imperative that we meet to discuss the situation." *Id.* at 12. The memo further stated that plaintiff's refusal to meet with Lackey could only be interpreted to mean that she was not serious about pursuing the allegations made in her grievance, and concluded with the suggestion that plaintiff contact him immediately.

On September 10, 1999, plaintiff sent a memo in response to Lackey's, which states in its entirety:

How dare you conclude from our conversation that this issue is not important to me. Just who do you think you are? I told you plain and clear in our conversation that I had my job to take care of, I had a memo to answer from your Director and I would like a representative of my choosing to be present, if and when, any investigation goes on and whether it is done by you or someone *not* like you.

Your memorandum was cruel and unfeeling. What? Have you been named as the prosecutor in this matter? I'll tell you what, [M]r. Lackey, don't you *ever* call me again. And don't you ever write me a memo with such a hateful and condescending message. In fact, I don't believe you have enough decency about you that I would want to meet with you anywhere. You're the one who brought up the investigation and that it was imperative that I meet with you, and I would have. However the second paragraph of your memo of [sic] shows your true colors. Were you also in the meeting at H.R. with Bill Verkest, Keith Melton and David Wynn? Did you get your directions on how to handle this situation and make the Engineering Staff smell clean? Also, I did not make a "complaint" as your memorandum erroneously states. What I actually did was to submit Grievances. *Grievances!* And I did not submit them to you. Or

for your scrutiny. Just because the Engineering Hierarchy has always contended, "That Human Resources is there to clean up our screw-ups. It's their job to straighten it out. That's what they get paid for", I do not have to subject myself to maltreatment by them or you.

Sorry, [M]r. Lackey, you are not qualified to interview me or investigate me. In fact, I don't even want someone with your pre-conditioned attitude around me, digging into any part of my life or having anything to do with me either on the job or off. Just stay away from me. I know what you're up to.

Def.App. at 13.

As Lackey was unsuccessful in interviewing plaintiff, the director of human resources personally met with plaintiff and interviewed co-workers and supervisors.

On September 13, 1999, plaintiff filed a grievance concerning an incident on September 10, 1999, when her time sheet was returned to her by Wynn with instructions to provide more detail for the 4.5 hours labeled "Miscellaneous Administration/Memos." Plaintiff declined, and told him "that if he wanted more detail, then to refer to the package of grievances [she] delivered to him about an hour earlier." The grievance then alleges that Wynn became angry and said " '*No, we're going to start having you document how all your time is being spent on this* ' (referring to my filed grievances)." *Id.* at 85. She then refused to do so unless he provided the instructions in writing. Plaintiff grieved that (1) Wynn's request was made out of hatred and retaliation for her filing grievances, (2) his behavior was "unprofessional, vicious, childish and totally unacceptable in the workplace," and (3) he was aware that she suffered from stress that he and others in the department caused by their authoritarian behavior. *Id.* Plaintiff

recommended that Wynn be suspended or terminated.

On September 17, 1999, Wynn sent plaintiff a memo detailing five performance issues and corresponding performance expectations. Plaintiff replied with a memo on September 17, 1999, alleging that the statements in Wynn's memo "were deliberately concocted in retaliation for [her] filing grievances." *Id.* at 90 *Id.* at 81–82. The remainder of her reply responds to the specific points raised by Wynn. At the end of the reply, plaintiff alleges that Wynn was conspiring with the director of human resources to "dig up dirt" on her and that if Wynn had any questions he could contact her attorney. *Id.* at 92.

On September 21, 1999, plaintiff filed a grievance alleging that Wynn's September 17, 1999, memo included "propaganda" and other inaccuracies which "literally make it impossible for [plaintiff] to get [her] job done." *Id.* at 88. Plaintiff grieved that Wynn (1) had discriminated against her by subjecting her to treatment inconsistent with that of other technicians which constitutes "methodical persecution," (2) had introduced "propaganda" which made it appear that she should be terminated, (3) is manufacturing information to get her fired, (4) is violating the rules, and (5) has been conspiring with another employee to collect evidence against her. Plaintiff then requested that Wynn be suspended or terminated. *Id.* at 89.

On September 30, 1999, plaintiff grieved that Wynn had assigned her to work on a project for a different department for which she did not have the training to properly perform. The grievance further stated that when plaintiff asked Wynn if he would use her failure to complete the task on her next job evaluation he responded "I'm not committing to anything." *Id.* at 114. Plaintiff alleged that this statement meant that he would use it against her and was a direct threat to her perfor-

mance appraisal. Plaintiff recommended Wynn be given supervisory training and suspended for five days. On October 1, 1999, Wynn responded that he was unable to resolve her grievance and that it would be forwarded to human resources.

On October 4, 1999, plaintiff filed a grievance regarding a request by Verkest that plaintiff and Wynn "visit" with him. *Id.* at 122. Verkest allegedly stated that, due to plaintiff's grievance activity, he was concerned that her opinion of her director and supervisor was so low. Plaintiff then asked to have a representative present, which was denied. Plaintiff grieved that (1) she was denied a representative, (2) Verkest lied by stating first that the visit was not grievance related but then stated that the visit was "because of the grievances," (3) Verkest was abusing the process for personal gain, and (4) Verkest was still not interested in resolving her concerns even after thirteen grievances. Plaintiff recommended disciplinary action against Verkest as well as "education and enlightenment." *Id.* at 122–23.

After completing an investigation into the allegations contained in plaintiff's grievances, Paulette R. Owens–Holmes, Director of Human Resources, sent plaintiff a memo, dated November 23, 1999, regarding the investigation. The memo noted that the investigation indicated that no discrimination had occurred, and went on to say,

> Of paramount concern is the adverse impact your behavior has had on others with the organization. Documents written by you consistently attacked and demeaned managers, co-workers and City staff on trivial matters. All employees, even those you do not agree with, deserve to be treated in a courteous and respectful manner. Additionally reasonable requests of supervisors should be promptly carried out without

harsh, conclusory accusations. Such unsupported confrontations undermine a cooperative and efficient work environment.

... Be advised that unreasonable, antagonistic behavior is not protected under City policy. I therefore admonish you to exercise caution in the manner in which you confront your supervisors, coworkers and City staff in the future. Failure to comport yourself in a reasonable and courteous manner may result in disciplinary action.

*Id.* at 9.

On December 9, 1999, Wynn sent plaintiff a memo indicating that she had achieved the first three performance expectations listed in his September 17, 1999, memo. *Id.* at 126. The memo further stated that plaintiff had not met the final two performance expectations and that failure to meet them "will result in disciplinary action up to and including termination of employment." *Id.* On December 28, 1999, plaintiff sent a memo to Wynn in response. *Id.* at 124. Plaintiff denied any shortfall in her performance, demanded that Wynn provide documentation of the shortfalls, and alleged that his memo was written solely in retaliation. She also claimed that she was denied representation at a December 16, 1999, meeting and that she had been ordered by the director of human resources not to submit any more grievances. Plaintiff demanded that Wynn be terminated as "a fair and just solution." *Id.*

On January 13, 2000, Verkest sent a memo notifying plaintiff of her proposed dismissal. *Id.* at 4. The memo charged plaintiff with violating Section V.B.2.d. of the City of Arlington Personnel Policies and Procedures Manual. Specifically the memo states that her December 28, 1999, memo was inappropriate in its harsh and accusatory tone and its recommendation that her supervisor be terminated. The memo also references the earlier warning given by the human resources director instructing plaintiff to cease her antagonistic behavior. (At his deposition, Verkest stated that plaintiff's grievances "had some bearing" on his decision to recommend her termination.[9])

Plaintiff's employment was terminated effective January 20, 2000. Subsequently, plaintiff filed charges of discrimination with the TCHR and the Equal Employment Opportunity Commission ("EEOC") on January 24, 2000, alleging retaliation. Plaintiff amended her EEOC charge to add a claim of discrimination based on religion. The charges specifically reference plaintiff's August 20, 1999, grievances. In addition, plaintiff sent a letter dated September 30, 1999, to the TCHR containing allegations of discrimination and completed an intake TCHR questionnaire on October 14, 1999. Plaintiff received her TCHR right to sue letter on July 30, 2001, and her EEOC right to sue letter on August 31, 2001.

### D. *Title VII Retaliation Claim*

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) she engaged in activity protected by Title VII, (2) she suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action. *See Evans v. City of Houston,* 246 F.3d 344, 351 (5th Cir.2001); *Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 427

---

9. Excerpts from Verkest's deposition are attached to plaintiff's response to defendant's motion for summary judgment. Plaintiff did not file a separately paginated appendix as required by Local Civil Rule 56.6. The court has, nevertheless, considered the materials she provided.

(5th Cir.2000). Plaintiff cannot sustain this initial *prima facie* burden.

A plaintiff engages in protected activity under Title VII if she has "opposed any practice made an unlawful employment practice by this subchapter," (the "opposition clause") or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter," (the "participation clause"). 42 U.S.C. § 2000e–3(a). Plaintiff's alleged protected behavior falls into three general classifications: (1) her EEOC and TCHR charges, (2) her 1999 filings with the TCHR, and (3) her internal grievances.

### 1. Protected Behavior Under the Participation Clause

■ Plaintiff asserts that all three classifications of behavior constitute protected behavior under the participation clause; however, her internally filed grievances do not constitute Title VII participation. *See, e.g. Byers,* 209 F.3d at 428 (reviewing internal complaints of discrimination under the opposition clause). The participation clause also does not apply to plaintiff's EEOC and TCHR charges as they were not filed until after the alleged retaliatory discharge took place.

■ Plaintiff's September 30, 1999, letter to the TCHR and October 15, 1999, TCHR intake questionnaire predate her termination and can constitute protected behavior under the participation clause. However, plaintiff cannot rely on her Fall 1999, TCHR filings to establish a *prima facie* case of retaliation as she has adduced no evidence that defendant was aware of those filings prior to its decision to terminate her employment. Without such evidence, plaintiff cannot satisfy the causation element of her *prima facie* case. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001).

### 2. Protected Behavior under the Opposition Clause

■ As noted above, plaintiff's numerous grievances filed pursuant to the City of Arlington's internal grievance procedure are to be analyzed under the opposition clause. Not all behavior taken in opposition to an employer's perceived discriminatory practice is protected under Title VII. *See Smith v. Texas Dep't of Water Resources,* 818 F.2d 363, 365–66 (5th Cir. 1987).

Two elements determine whether opposition behavior is protected by Title VII. First, plaintiff's behavior must be in opposition to a practice that a reasonable person would find discriminatory. *See Breeden,* 121 S.Ct. at 1510. Second, the behavior must not "be so inappropriate as to justify the curtailment of statutorily-afforded safeguards," *Douglas v. DynMcDermott Petroleum Operations Co.,* 144 F.3d 364, 373 (5th Cir.1998), as "some conduct, even if in sincere opposition to unlawful employment practices under Title VII, may be so disruptive or inappropriate as to fall outside the [statute's] protections," *Jones v. Flagship Int'l,* 793 F.2d 714, 728 (5th Cir.1986). To determine whether opposition behavior is inappropriate, and, therefore, not entitled to protection under the opposition clause, the court must balance the employer's right to run its business with the employee's right to express her grievances. *See Douglas,* 144 F.3d at 373–74. Where "the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed," his otherwise protected behavior ceases to be protected opposition under Title VII. *See Jones,* 793 F.2d at 728 (quoting *Rosser v. Laborers' Int'l Union,* 616 F.2d 221, 223 (5th Cir.1980)). The longstanding rule in

the Fifth Circuit is that the employee's conduct must be reasonable in light of the circumstances. *See Jefferies v. Harris County Community Action Ass'n,* 615 F.2d 1025, 1036 (5th Cir.1980).

The court concludes that, as a matter of law under the summary judgment record, plaintiff's grievances do not constitute protected behavior under the opposition clause. First, the grievances relating to plaintiff's August 2, 1999, performance evaluation [10] are not protected, as a reasonable person could not find religious discrimination based on the incident involving a poster for a movie titled "Jesus," in a subsection of the performance review, where the purpose of that reference was to show plaintiff's tendency to disrupt operations by discussing policies and decisions with which she disagreed. In her response, plaintiff makes the conclusory statement that she "reasonably believed that Wynn intentionally placed the 'Jesus' comments in her performance review because of the fact that she is Jewish." Resp. at 4. Her cited support for this conclusory statement is a portion of the transcript of her deposition where she makes the statement, among others, that she can point to no anti-Semitic remark in her performance review but that she believed the performance review was motivated by racial animus because her supervisor, "has [had] something against me for many years just because I'm different." Kaplan Dep. at 40. Such conclusory statements are insufficient to withstand summary judgment. *See Simmons,* 746 F.2d at 269. *See also Grizzle v. Travelers Health Network, Inc.,* 14 F.3d 261, 268 (5th Cir. 1994).

Second, as a matter of law, the manner in which plaintiff expressed her opposi-tion to the perceived discrimination was not reasonable. Plaintiff's dozen plus grievances and rebuttals were consistently hostile and inflammatory. Plaintiff made unsupported accusations against her supervisors of conspiring against her and engaging in retaliation or "methodical persecution." She rebuffed her supervisors' attempts at counseling, and repeatedly demanded that her supervisors be terminated or sent to "two or more weeks" of counseling. Particularly troubling is plaintiff's September 10, 1999, response to Lackey, the individual charged with investigating plaintiff's grievances. Plaintiff responded to Lackey's mildly worded letter with a lengthy invective that included statements that she didn't want him to call her again "or hav[e] anything to do with [her] on the job or off," and accusations of him conspiring as part of a cover up, which finished with the directive: "Just stay away from me. I know what you are up to." In addition, the shear volume of plaintiff's grievances suggests that she was rendered ineffective in the performance of her job. For example, there is undisputed evidence that plaintiff filed as many as nine grievances in a single day, and that, when asked whether she had spent over four hours of her work day filing grievances, plaintiff responded by filing yet another grievance.

Plaintiff adduced no evidence disputing the facts related above or that would adequately explain her behavior or justify her refusal to cooperate with defendant's investigation of her grievances. Indeed, plaintiff stated in her deposition that she regretted filing some of the grievances because the language was excessive and

---

**10.** Plaintiff does not assert opposition clause protection for her grievances of June and July 1999 concerning her interactions with co-workers and defendant's response to those complaints. Further, the subject matter of those grievances appear wholly unrelated to any reasonable charge of Title VII discrimination.

counterproductive. *See* Kaplan Dep. at 28–29.

Applying the balancing test to these facts, the court concludes from the undisputed evidence that plaintiff's grievances are not entitled to protection under Title VII. *See, e.g. Robbins v. Jefferson County School District,* 186 F.3d 1253, 1259 (10th Cir.1999) (holding no Title VII protection, as a matter of law, where plaintiff "lodged frequent, voluminous, and sometimes specious complaints and engaged in antagonistic behavior toward her supervisors"); *Rollins v. State of Florida Dep't of Law Enforcement,* 868 F.2d 397, 401 (11th Cir. 1989) (holding no Title VII protection where plaintiff "had earned the reputation as a disruptive complainer who antagonized her supervisors and colleagues and impaired the morale of her unit").

\*       \*       \*       \*       \*       \*

For the reasons stated above, plaintiff has failed to adduce evidence that would lead to a conclusion that she engaged in a protected activity. Therefore, her retaliation claim fails.

### E.   *Alleged ADA Claim*

The court finds no mention of a cause of action under the ADA in plaintiff's amended complaint. Further, a claim of disability discrimination is neither stated in her EEOC charge nor within the scope of the charge. As a result, plaintiff cannot assert such a claim. *See Fine v. GAF Chemical Corp.,* 995 F.2d 576, 578 (5th Cir.1993).

### IV.

### *ORDER*

For the foregoing reasons,

The court ORDERS that:

a.   Defendant's motion for judgment on the pleadings, be and is hereby, granted.

b.   Defendant's motion for summary judgment be, and is hereby, granted.

c.   All claims of plaintiff be, and are hereby, dismissed.